## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## HELENA DIVISION

IN RE:  BRYAN T. GRIGSBY,                              Case No. 2:16-bk-12601J
                                                                    (Chapter 7)
                        **Debtor.**


CROSS COUNTY BANK                                              PLAINTIFF

VS.                            AP Case No. 2:16-ap-01074

BRYAN T. GRIGSBY                                              DEFENDANT


### <u>MEMORANDUM OPINION</u>

Before the Court is the *Complaint Seeking Exception to Discharge Pursuant to 11 U.S.C.*

*§ 523(a)(2) and Objection to Discharge Pursuant to 11 U.S.C. § 727(c)* filed by Cross County

Bank ("**CCB**") on August 19, 2016 (the "**Complaint**"), and the *Answer* filed by Bryan T.

Grigsby (the "**Debtor**") on September 7, 2016.

CCB seeks a determination that its debt is nondischargeable pursuant to 11 U.S.C.

§ 523(a)(2)(B), alleging the Debtor incurred the debt with an intent to deceive the bank by

providing a false financial statement to CCB.  The Debtor denies these allegations and argues the

bank did not reasonably rely on the financial statement.  The Debtor argues further that he had no

intent to deceive CCB so the debt should be discharged.

CCB also seeks denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4)(A),

alleging the Debtor made several false oaths or accounts in his schedules and statement of

financial affairs concerning, *inter alia,* his income, ownership of a business, and the closure of

bank accounts.[1]  The Debtor denies that his discharge should be denied and argues he did not make any statements in his schedules or statement of financial affairs with fraudulent intent.

A trial on the merits was held in Helena, Arkansas.  Vincent E. Guest appeared on behalf of CCB and Charles P. Allen, Jr. appeared on behalf of the Debtor.  At the conclusion of the trial, the Court took the matter under advisement, and the parties submitted post-trial briefs on the issues.  For the reasons stated herein, the relief sought by the Plaintiff is granted; the debt owed to CCB is nondischargeable and the Debtor is denied a discharge.

## I.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).  The parties consent to this Court entering a final judgment in this matter.

## II.

## FACTS

The Debtor is currently a mechanic but was engaged in farming operations from 2011 to 2015, farming row crops for himself and also performing custom hire services.  From 2011 until 2015 he conducted his farming operations with crop loans from banks.

First Commercial Bank is a branch of CCB.[2]  The Debtor has been an agricultural loan customer of CCB (and its predecessor) since 2011.  Judy Brown testified on behalf of CCB.  She is a vice president of CCB and her job duties include making agricultural loans.

---

[1] In the Complaint, CCB alleges additional false oaths, but those additional allegations were not addressed at trial.

[2] The Court will refer to First Commercial Bank and CCB interchangeably as CCB.

In early 2015, the Debtor and CCB entered into three loan transactions.  Only the second loan transaction is the subject of this adversary proceeding, but evidence of the three loans was introduced at trial and is helpful to understanding the series of events and relationship between the parties.  The first of the three loans was evidenced by a promissory note dated March 12, 2015, in the original principal amount of $90,000.00 (the "**March Loan**").  (Jt. Ex. 1).  The proceeds from the March Loan were to be used by the Debtor to purchase equipment.  As collateral for the March Loan the Debtor granted CCB a mortgage on real property located in Monroe County, Arkansas, as reflected by a mortgage dated March 12, 2015.  (Jt. Ex. 2).  CCB recorded the mortgage in the real estate records of the Monroe County Circuit Clerk's office on March 20, 2015.  (Jt. Ex. 2).

The Debtor testified that he used proceeds from the March Loan to purchase several pieces of small equipment including an Athens levee disc, a John Deere 630 disc, a Case IH 7140 tractor, a 980 field cultivator, a levee hog squeezer, and a float.  In addition, some of the proceeds were used as a down payment for larger equipment including a John Deere 9760 Combine, a John Deere 625D Header, and a John Deere 8400 Tractor.

The second loan transaction entered into between the Debtor and CCB in 2015 was a line of credit loan to be used by the Debtor for his farming operations (the "**LOC Loan**").  This loan is reflected by a promissory note dated April 16, 2015, in the principal amount of $384,000.00.  The LOC Loan is secured by a security interest in "All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Farm Products, Farm Equipment, Crops, FSA / NRCS Payments, [and] Crop Insurance."  (Jt. Ex. 4).  The security interest included all equipment and farm equipment now owned or hereafter acquired.  (Jt. Ex. 4).  CCB filed a UCC financing

statement covering the collateral on April 17, 2015.  (Jt. Ex. 5).  It is the balance owed on the LOC Loan that CCB asks this Court to declare nondischargeable.

The third loan transaction was evidenced by a promissory note executed by the Debtor on August 13, 2015, in the principal amount of $65,600.00.  (Jt. Ex. 6).  This loan was used by the Debtor to purchase the Debtor's residence and was secured by the Debtor's residence located at 448 Phillips 252 Road, Lexa, Arkansas.  (Jt. Ex. 7).  The mortgage was filed in the real estate records of the Phillips County Circuit Clerk's Office on August 17, 2015.  (Jt. Ex. 7).

In connection with the various loans at the bank the Debtor was required to provide financial statements.  Ms. Brown testified the first time a borrower provides a financial statement to CCB he is given a blank financial statement to fill out.   After the initial financial statement is on file, CCB will give the borrower the latest financial statement on file along with a new, blank one to fill out.  She testified that borrowers sometimes, however, simply make revisions to the one on file.  The Debtor testified that he filled out a financial statement in 2011 but after that he merely updated the information from year to year by telling the bank what assets he had at the time.

According to Ms. Brown's testimony, in relation to crop loans such as the LOC Loan, CCB relies on the financial statement information to calculate whether a borrower's financial condition supports an extension of credit to the borrower.  The bank considers the borrower's current liabilities to determine the borrower's cash flow and his ability to make payments on his current obligations.  CCB also considers the borrower's net worth and the value of the collateral available to secure the loan to determine if the collateral supports the loan amount.  If the collateral is insufficient to secure the loan amount, CCB attempts to obtain an FSA guaranty for the loan.

4

A financial statement dated December 2, 2014, which predated the March Loan, was introduced into evidence. (Jt. Ex. 16 at 1). The December 2014 financial statement reflected the Debtor's net worth as $279,000.00. (Jt. Ex. 16 at 1). When asked whether he reviewed the December 2014 financial statement the Debtor stated that he did not, but he also stated that he would have provided the information on the December 2014 financial statement to CCB. The Debtor testified that the information on the December 2014 financial statement was "pretty accurate." (Tr. at 108).

An updated financial statement, dated March 25, 2015, was also introduced into evidence. (Jt. Ex. 17). The March 2015 financial statement was given in connection with the LOC Loan and is the financial statement most at issue in this adversary proceeding. The Debtor's net worth according to the March 2015 financial statement was $432,300.00, $153,300.00 greater than the net worth listed on the December 2014 financial statement. (Jt. Ex. 17). The March 2015 financial statement listed $586,750.00 in total assets consisting of the following: cash $500.00; investment in growing crops $55,000.00; farm machinery $265,000.00; vehicles $40,000.00; house and one acre $30,000.00; seven acres office and shop $20,000.00; 38.5 acres farm ground $96,250.00; and forty acres flooded timber $80,000.00. (Jt. Ex. 17). The financial statement listed $154,450.00 in total liabilities, consisting of the following: First Commercial $3,950.00; Western Equipment Finance $37,500.00 (with an annual payment of $12,772.00); Ally $23,000.00 (with a monthly payment of $404.00); and First Commercial (land) $90,000.00 (with an annual payment of $12,725.00). (Jt. Ex. 17). The Debtor's signature is on the bottom of the financial statement immediately below the following paragraph:

> Please Read before signing*** I/We hereby certify that the information contained on this financial statement is materially exact and true to the best of my/our

5

knowledge and belief.  This information is provided to the Cross County Bank for the express purpose of inducing the extension of credit accommodations.  I/We hereby authorize the Cross County Bank to materially rely on the information I/We have provided.

(Jt. Ex. 17).

When asked whether the difference in net worth from the December 2014 financial statement to the March 2015 financial statement raised a "red flag," Ms. Brown testified it did not.  She explained that the Debtor had a good 2014 crop year and had paid off his crop loan with CCB early in November 2014.  She testified that many factors can result in a farmer's net worth changing from one year to the next including leftover inventory, equipment values, and net income.

The Debtor testified that he signed the March 2015 financial statement but that the information on the financial statement was filled out by CCB.  Dana Swindle, Ms. Brown's secretary, testified that the information on financial statements would have been typed in by Ms. Brown.  The Debtor stated that he "trusted the bank to have this stuff right."  (Tr. at 117).  He did admit that he was the one who provided all the information to CCB but testified some of the information was simply copied over from the prior financial statement.

In reviewing the March 2015 financial statement at trial the Debtor noted that the house and one acre should not have been listed on the March 2015 financial statement because the house burned in November 2014.[3]  The Debtor testified that CCB would have been aware of the loss because the house was collateral for a loan with CCB.  The Debtor stated that the asset was transferred from the previous financial statement by CCB.  When asked if he pointed out this

---

[3] No explanation was given as to why it was listed on the December 2014 financial statement, as the fire predated this financial statement as well.

6

error to CCB at the time he reviewed the March 2015 financial statement he responded, "I didn't review it. I signed it." (Tr. at 120).

In addition to the inaccuracy of the value of the house that burned, the Debtor admitted that the liability owed to Western Equipment Finance listed as $37,500.00 should have been "around a hundred and twenty something thousand [dollars]," and accordingly that his overall net worth was not accurate. (Tr. at 126).

When asked on direct examination if he told CCB that the information was not correct the Debtor responded:

> A    Mr. Vince, I told you earlier, I didn't review these papers. When they told me I got my loan, I come in and signed them, and that's a very bad mistake that I made, and it's – I have no – no excuse for it is the only thing I can say.
>
> Q    Okay.
>
> A    I relied – pretty much, I relied on them to have it correct. When I called them, like I had in past years, I told them over the phone, or when I came in, I told them what I had. I never actually sat down and filled out one of these since 2011.

(Tr. at 122).

The direct examination testimony continued as follows:

> Q    But you didn't correct that figure [the liability to Western Equipment Finance] with Ms. Brown or Ms. Swindle?
>
> A    I told you I didn't look at this. I apologize about it.
>
> Q    Do you think there was a purpose that the bank required this financial statement from you?
>
> A    Yeah. Yes, sir.
>
> Q    And what was their purpose in requiring it?
>
> A    To see what you're worth.

Q    And why would they want to know what you were worth?

A    To give you a loan.

Q    To give you a loan?

A    Yes, sir.

Q    Do you think if you hadn't been worth that amount that you wouldn't have got the loan that you did?

A    I think I still would have got the loan.

Q    Okay.  And why do you think that?

A    Because I thought that a lot of it was based on how many acres you was farming –

Q    Okay.

A    -- your crop, and, I mean, we had other options.  I mean, that's – like I said, I didn't look at this financial statement, so that's why I guess it's wrong, and that's a very bad mistake I made, but I knew I could get the loan.  It's not like I didn't think I could get the loan.

(Tr. at 126–27).

In addition to the March 2015 financial statement, the Debtor also provided CCB with a list of equipment in connection with the LOC Loan.  Willie Oxner appraised the equipment for CCB.  The appraisal, dated March 30, 2015, valued all the equipment at an aggregate fair market value of $265,000.00, which is the same number reflected for farm machinery on the March 2015 financial statement.  (Jt. Ex. 15).  Items appraised pertinent to the issue before the Court include the following:

| Equipment | Appraised Value |
|---|---|
| John Deere 9760 Combine | $95,000.00 |
| John Deere 625D Header | $32,500.00 |
| John Deere 8400 Tractor | $50,000.00 |

(Jt. Ex. 15).

8

Pursuant to its normal procedures, CCB ordered a UCC lien search and credit report in connection to the Debtor's LOC Loan. The UCC lien search contained a financing statement filed by Western Equipment Finance as the secured party on February 24, 2015, listing the John Deere 9760 Combine and John Deere 625D Header as collateral. (Jt. Ex. 19 at 46–47). This equipment was listed on the list of equipment the Debtor gave to CCB. (Jt. Ex. 15). Ms. Brown testified that the Western Equipment Finance UCC financing statement did not cause her concern because there was a liability to Western Equipment Finance listed on the March 2015 financial statement. Nothing on the UCC filing indicates the amount of the lien. Ms. Brown accordingly adjusted the value of the equipment available as collateral by $37,500.00, the amount listed as owed to Western Equipment Finance on the March 2015 financial statement.

The UCC lien search also contained a financing statement filed January 19, 2015, listing TCF Equipment Finance as the secured party with the collateral being listed as the John Deere 8400 Tractor and related collateral. (Jt. Ex. 19 at 42–43). This equipment was listed on the list of equipment the Debtor gave to CCB. (Jt. Ex. 15). Ms. Brown testified that she did not see this financing statement during the time of the loan processing but did discover it after the Debtor filed bankruptcy.

The Equifax credit report pulled by CCB in connection with the LOC Loan listed neither Western Equipment Finance nor TCF Equipment Finance. Ms. Brown testified that it is not unusual for "commercial loans" not to be on the credit report and for that reason CCB relies on the borrower to disclose any outstanding commercial loans on the financial statement. CCB also relies on the borrower's information instead of calling the borrower's creditors directly for loan balance information.

9

At trial, the Debtor was asked about the other liens on the equipment.  The Debtor

testified that prior to the March Loan Ms. Brown indicated to him that CCB could not "handle"

the financing for everything he wanted to do so he financed a few pieces of equipment

elsewhere.  When asked whether he told the bank some equipment was financed he answered,

"Yes, sir, I told them that I had financed it somewhere else."  (Tr. at 161).  He then added:

> I can't remember the exact conversation we had.  I mean, that's three years ago.
> But, I mean, I told them that – I mean, I – they knew I didn't have 175,000 dollars
> cash to buy that – them equipment.  They knew I financed it.  I had spoken to them
> about it, yes, sir, to answer that question.

(Tr. at 161-62).  The evidence did not reveal when the Debtor told CCB some equipment was

financed, or if the Debtor told CCB the specific pieces of equipment that were financed.

The Debtor agreed to maintain insurance on the collateral as reflected on an "Agreement

to Provide Insurance."  (Jt. Ex. 13 at 3).  The proof of insurance for the John Deere 9760

Combine and John Deere 625D Header did reflect Western Equipment Finance as the "Insured

Lender" and First Commercial Bank as the "2nd Lien Holder."  (Jt. Ex. 14 at 2).  The proof of

insurance, however, was not received by CCB until April 29, 2015, *after* the loan had closed.

After the LOC Loan was approved, the Debtor requested funds on the LOC Loan as

needed and CCB deposited the requested funds into the Debtor's bank account.  The balance due

on the LOC Loan as of May 22, 2018, was $151,504.97, consisting of $115,384.70 in principal,

$36,020.27 in interest, and $100.00 in late charges.

The Debtor filed a voluntary petition for relief under the provisions of Chapter 7 of the

Bankruptcy Code on May 15, 2016.  (Jt. Ex. 20).   After the Debtor filed bankruptcy, CCB

learned that it did not have a first priority security interest in the John Deere 9760 Combine, the

John Deere 625D Header, or the John Deere 8400 Tractor.  These three items of collateral were

valued in Mr. Oxner's appraisal at $177,500.00.  (Jt. Ex. 15).  Ms. Brown testified that she could

not recall the exact amount of the prior liens on these three pieces of equipment, but she did recall that there was no equity for CCB in the equipment.

Ms. Brown testified that had CCB known there was a prior lien on $177,500.00 worth of the collateral, CCB would not have made the LOC Loan without either obtaining additional collateral for the loan or seeking an FSA guaranty on the loan. The testimony revealed that the forty acres of timber valued on the Debtor's March 2015 financial statement at $80,000.00 was free and clear of liens.

The Debtor's bankruptcy petition and schedules were introduced into evidence. (Jt. Ex. 20). The Statement of Financial Affairs (the "**SOFA**") filed by the Debtor reflected only $658.00 in income from employment or business operations for 2014, no income for 2015, and no income for 2016 up to the date of the bankruptcy filing in May. (Jt. Ex. 20 at 26).

At trial the Debtor admitted that from January 2014 to July or August 2014 he worked as a farmhand for Turner Grain and earned $400.00 or $500.00 per week, but he had forgotten about that income when he filled out the SOFA. He stated this was a mistake and he did not intentionally omit the income.

At trial the Debtor also testified that he started a limited liability company in 2014 named Daytana Farms which he used in connection with an informal farming venture with Jason Coleman and Dale Bartlett. He was the sole member of Daytana Farms and he did not believe the LLC still existed at the time of the bankruptcy filing or trial. The Debtor's 2014 federal income tax return, Schedule F, reflected $20,794.00 in gross farming income for Daytana Farms and $32,271.00 in expenses, for a net loss of $11,477.00. (Jt. Ex. 8). The Debtor explained he did not include the gross income on his SOFA because he had a net loss instead of income.

11

The Debtor similarly explained that in 2015 he worked for himself and had a net loss instead of income so he did not believe there was anything to include on the SOFA.  In early 2016 he was not employed and took advantage of the SNAP program to provide for his children, although he admitted he obtained employment in the few weeks prior to filing bankruptcy but was unsure of whether he had received a paycheck at the time he filed his petition.  He also mistakenly omitted $1,000.00 in rent paid to him in early 2016 by Wilson Farms for rental on farm land the Debtor was not farming.

In response to Question 18 on the SOFA asking for information for any businesses the Debtor has been involved in within the last six years as an "officer, director, partner, or managing executive of a corporation, partner in a partnership, [or] sole proprietor" the Debtor responded "none," not disclosing Daytana Farms.  (Jt. Ex. 20 at 31).  The Debtor explained that he had not realized the question was going back six years and he did not realize he needed to list Daytana Farms because it did not exist at the time he filled out the SOFA.

On his SOFA in response to the question asking for all financial accounts closed within one year of the bankruptcy filing the Debtor listed one account with CCB closed in 2015.  (Jt. Ex. 20 at 29).  He testified at trial, however, that he withdrew all the money from a savings account at Southern Bancorp in the earlier part of 2015, and he also testified that he closed a bank account at a bank in Holly Grove sometime after 2014 which he had used for Daytana Farms.

The Debtor testified that he did review the petition, schedules, and SOFA, and that he had read and answered the questions to the best of his knowledge.  He also was adamant that anything not included was unintentionally left off.

III.

DISCUSSION

A.  Section 523(a)(2)(B)—Determination of Dischargeability

Section 523(a)(2)(B) of the Bankruptcy Code provides that a discharge does not discharge a

debtor for any debt for money to the extent obtained by:

> **(B)** use of a statement in writing--
> **(i)** that is materially false;
> **(ii)** respecting the debtor's or an insider's financial condition;
> **(iii)** on which the creditor to whom the debtor is liable for such money . . . reasonably relied; and
> **(iv)** that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B) (2012).  The Plaintiff bears the burden of establishing all of the

elements of Section 523(a)(2)(B) by a preponderance of the evidence.  *Samuel J. Temperato*

*Revocable Trust v. Unterreiner (In re Unterreiner)*, 699 F.3d 1022, 1025 (8th Cir. 2012) (citing

*Jacobus v. Binns (In re Binns)*, 328 B.R. 126, 130 (B.A.P. 8th Cir. 2005)).

CCB argued the debt owed to it on the LOC Loan should be declared nondischargeable

because the March 2015 financial statement meets each of the elements of Section 523(a)(2)(B).

The Debtor agreed the March 2015 financial statement is a statement in writing that is materially

false and concerns the Debtor's financial condition, but argued the remaining two elements,

whether the bank reasonably relied on the financial statement and whether the Debtor made the

statement with intent to deceive, were not met.  (Debtor's Post-Trial Brief, Doc. No. 32 at 6).

These remaining two elements will be discussed below.

Reasonable Reliance.

Whether a creditor reasonably relied on the written statement is determined based on the

"'totality of the circumstances.'"  *First Nat'l Bank of Olathe, Kan. v. Pontow*, 111 F.3d 604, 610

(8th Cir. 1997) (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.

13

1993) (en banc)).  The Court may consider a variety of things including '"whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.'"  *Id.* (quoting *In re Coston*, 991 F.2d at 261).  '"Reasonable reliance can [ ] be demonstrated by showing that credit would not have been extended had accurate information been provided."'  *Helena Chem. Co. v. Richmond (In re Richmond)*, 429 B.R. 263, 298 (Bankr. E.D. Ark. 2010) (quoting *Rosen's, Inc. v. Ghere (In re Ghere)*, 393 B.R. 209, 217 (Bankr. W.D. Mo. 2008)).

Here, the evidence revealed that CCB relied on information contained in the Debtor's financial statement in extending credit to the Debtor.  Specifically, in deciding whether to loan money to the Debtor, CCB considered the Debtor's current liabilities and cash flow, as well as the Debtor's net worth and the value of collateral available to secure the loan.  The evidence revealed that the Debtor's December 2014 financial statement showed a net worth of $279,000.00.  Before making the LOC Loan in the amount of $384,000.00, CCB required an updated financial statement from the Debtor.  This updated financial statement reflected an increase in the Debtor's net worth to $432,300.00, an amount in excess of the principal amount of the LOC Loan.

The evidence also revealed that CCB obtained a credit report and UCC lien search in connection with the LOC Loan.  The credit report did not show the priority liens of Western Equipment Finance on the combine and header or TCF Equipment Finance's lien on the tractor. The UCC lien search did reveal the liens of these two creditors.  However, the testimony revealed that the lien of Western Equipment Finance on the combine and header was not a red flag because a debt owed to Western Equipment Finance was listed on the March 2015 financial

14

statement.  CCB took this debt, as stated in the March 2015 financial statement in the amount of $37,500.00, into consideration when making the LOC Loan, but had no reason to know or believe the debt amount was actually around $127,500.00, about $90,000.00 *more* than the amount listed on the financial statement.[4]  Had this additional liability been disclosed on the March 2015 financial statement, the Debtor's net worth would have been reduced to approximately $342,300.00, an amount significantly less than the principal amount of the LOC Loan.

As to the debt owed to TCF Equipment Finance, Ms. Brown testified that she missed this UCC filing in reviewing the lien search.  Again, the UCC filing does not state the amount of the lien.  Had she seen it, she would have inquired further, which may have alerted her to the lien on the tractor that was valued at $50,000.00 on the appraisal.

Ms. Brown testified that it was not until after the Debtor filed for bankruptcy that CCB became aware of the prior liens on the three pieces of equipment.  Ms. Brown testified that had CCB been aware of the prior liens on the combine, header, and tractor, it would not have made the LOC Loan to the Debtor as the loan was made.  Rather, CCB would have looked to obtain a lien on additional collateral, such as the unencumbered acreage owned by the Debtor, or would have looked for a guaranty from the FSA.  The Court finds this testimony credible.  The Court is aware the Debtor testified that he told CCB he financed some equipment, but his testimony on this issue was brief and vague.  The Debtor was not specific about what he may have said to CCB or when he may have said it.  The Court finds that the weight of the evidence supports a

---

[4] Ms. Brown testified that there was no equity in the equipment to service CCB's second lien position.  In the appraisal, Mr. Oxner valued the combine at $95,000.00 and the header at $32,500.00, for a total of $127,500.00. The Debtor agreed the debt to Western Equipment Finance was "around a hundred and twenty something thousand [dollars]."  (Tr. at 126).

15

finding that CCB did not know it held a second priority security interest in the combine, header, and tractor when it made the LOC Loan.

The Debtor cites the case of *First National Bank of Stuttgart v. Owens (In re Owens)*, 322 B.R. 411 (Bankr. E.D. Ark. 2005), in support of his argument that CCB did not reasonably rely on the March 2015 financial statement in making the LOC Loan. In *Owens*, Judge Mixon found the creditor did not reasonably rely on a financial statement that omitted several liabilities owed by the debtor farmer including obligations owed to Commodity Credit Corporation ("CCC"). *Id.* In *Owens*, upon questioning by the Court, the bank officer admitted he was aware of the CCC loans as he was the party responsible for releasing and subordinating the creditor's interest in crops to the indebtedness owed to CCC. *Id.* at 417–18. In addition, CCC's security interests were documented in lien searches conducted by the bank officer, which the Court found to be a red flag that should have alerted the bank to undisclosed liabilities. *Id.* at 421. As to the remaining undisclosed liabilities, the Court found that the bank officer and debtor had agreed at a prior point in time that those liabilities need not be disclosed on the financial statement. *Id.*

Here, the facts are distinguishable from the *Owens* case. First, unlike the bank in *Owens*, the Court finds that CCB did not have actual knowledge of the prior liens on the combine, header, and tractor. Second, as stated above, the Court does not find that Western Equipment Finance's security interest, which was contained in the UCC lien search conducted by Ms. Brown, was a red flag that should have alerted CCB to the prior lien on the combine and header. A debt owed to Western Equipment Finance was listed on the March 2015 financial statement and was considered by CCB when making the LOC Loan. The Court finds it was reasonable for the bank to rely on the debt amount stated on the financial statement rather than independently investigating the extent of the indebtedness owed by the Debtor to Western Equipment Finance

16

under the facts of this case.  Finally, this case is distinguishable from *Owens* because the record was devoid of an agreement between CCB and the Debtor to not disclose certain liabilities on the financial statement, as was the case in *Owens*.

The Court recognizes this case has one similarity with the *Owens* case as it concerns the debt owed to TCF Equipment Finance, which was revealed in the lien search, but not included in the March 2015 financial statement.  Ms. Brown admitted at trial that she simply missed this UCC filing in reviewing the lien search.  Although TCF Equipment Finance's UCC filing may have been a red flag that should have alerted CCB of TCF Equipment Finance's lien, considering the evidence as a whole, the Court finds that, despite the missed UCC filing, the weight of the evidence supports a finding that CCB reasonably relied on the March 2015 financial statement in making the LOC Loan.   Based on Ms. Brown's credible testimony as to CCB's loan process, the Court finds that the understated liability to Western Equipment Finance, alone, would have required CCB to re-work the loan to add additional collateral or seek an FSA guaranty.

The totality of the circumstances reveals that CCB relies on financial statements in extending credit of this nature; that it requested an updated financial statement from the Debtor in connection with the LOC Loan; that the updated financial statement reflected a net worth of $432,300.00, an amount in excess of the $384,000.00 loan; that CCB obtained an updated appraisal of the equipment being given as collateral; and that CCB obtained a credit report and a UCC lien search prior to making the loan.  If the correct amount of the Western Equipment Finance loan had been subtracted from the available collateral value, the resulting net worth would have been about $40,000.00 *less* than the amount of the LOC Loan.  Notwithstanding the missed lien of TCF Equipment Finance on the tractor that was not disclosed by the Debtor on which CCB could have made further inquiry, the debt owed to Western Equipment Finance

would have been enough to cause the parties to restructure this loan.  Most importantly, the Court finds Ms. Brown's testimony credible that, had she known about the prior liens, the loan as it was would not have been made.  For all these reasons, the Court finds that CCB met its burden of proving that it reasonably relied on the March 2015 financial statement in making the LOC Loan.

<u>Intent</u>.

Intent to deceive does not require the debtor to "have a 'malignant heart.'"  *Agribank, FCB v. Webb (In re Webb)*, 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000) (quoting *Tex. Am. Bank, Tyler, N.A. v. Barron (In re Barron)*, 126 B.R. 255, 260 (Bankr. E.D. Tex. 1991)).  "Rather, intent to deceive necessarily focuses upon the objective facts and circumstances."  *Id.*  "'Direct evidence of intent rarely exists and courts may look to surrounding circumstances to ascertain intent.'"  *In re Richmond*, 429 B.R. at 298 (quoting *In re Ghere*, 393 B.R. at 215).  "[A] debtor's 'reckless indifference to or reckless disregard [for] the accuracy of [ ] information' is sufficient to prove this subjective intent prong."  *Id.* (quoting *Fairfax State Sav. Bank v. McCleary (In re McCleary)*, 284 B.R. 876, 888 (Bankr. N.D. Iowa 2002)); *see also In re Webb*, 256 B.R. at 297 (stating that "[k]nowledge of the falsity of the information or reckless disregard for the truth of the information satisfies the intent element of section 523(a)(2)(B)").  In addition, "mere unsupported assertions of honest intent do not overcome the natural inferences derived from the admitted facts."  *In re Webb*, 256 B.R. at 297.

In *Twin City Bank v. Harris (In re Harris)*, 360 B.R. 267, 271–72 (Bankr. E.D. Ark. 2007), Judge Evans found the debtor who knew of his net worth but merely "glanced" at a financial statement before signing it acted with reckless indifference to the accuracy of the

information and therefore acted with intent to deceive the bank for purposes of Section 523(a)(2)(B).

Here, the evidence revealed that the Debtor acted with reckless disregard for the truth in signing and submitting the March 2015 financial statement to CCB. The Debtor repeatedly admitted that he did not review the March 2015 financial statement or the accuracy of the information contained therein. Like the debtor in *Harris*, the Debtor had sufficient information to be able to ascertain his net worth and could have revealed the inaccuracy of the March 2015 financial statement had he taken a moment to review it.

The Debtor's belief that he would be given the crop loan regardless of the information on his financial statement is somewhat consistent with Ms. Brown's testimony. This belief apparently also led the Debtor to believe he did not need to review and check the accuracy of the information provided. The gap in the Debtor's logic is that the LOC Loan would not have been based on the *same terms* if the Debtor had disclosed the true liabilities he owed. The Debtor and Ms. Brown both testified that there would have been other options. These other options would have changed the terms of the loan by CCB requesting additional collateral or seeking an FSA guaranty.

While the Debtor may not have acted with a malignant heart, his "mistake" in signing the March 2015 financial statement, certifying that the information was "exact and true" without reviewing the accuracy of the information, was an act done with reckless disregard for the truth. Accordingly, the Court finds that CCB met its burden of proving the Debtor acted with the requisite intent to deceive.

Because each of the elements of Section 523(a)(2)(B) is met, the Court finds that the debt owed to CCB by the Debtor on the LOC Loan in the amount of $151,504.97 as of May 22, 2018, is nondischargeable.

**B. Section 727(a)(4)—Objection to Discharge**

Section 727(a)(4) of the Bankruptcy Code provides that a discharge will be granted unless "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A) (2012). This provision helps to ensure "'full and complete disclosure of any and all apparent interests of any kind.'" *Korte v. IRS (In re Korte)*, 262 B.R. 464, 474 (B.A.P. 8th Cir. 2001) (quoting *Fokkena v. Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)). "The debtor's 'petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Id.* (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)).

Under Section 727(a)(4)(A), the plaintiff must prove five elements: (1) "'the Debtor made a statement under oath; (2) the statement was false; (3) the Debtor knew the statement was false; (4) the Debtor made the statement with fraudulent intent; and (5) the statement related materially to the Debtor's bankruptcy case.'" *Kaler v. Charles (In re Charles)*, 474 B.R. 680, 684 (B.A.P. 8th Cir. 2012) (quoting *Lincoln Sav. Bank v. Freese (In re Freese)*, 460 B.R. 733, 738 (B.A.P. 8th Cir. 2011)).

<u>False statements made under oath</u>.

The first two elements that must be met under Section 727(a)(2)(A) are that the Debtor made a statement under oath and that statement was false. A debtor's schedules and statements filed in his bankruptcy case are signed under penalty of perjury and, therefore, constitute oaths

for purposes of Section 727(a)(4)(A).  In addition to inaccuracies, an omission of an asset can constitute a false oath.  *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005) (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

At trial, CCB alleged the Debtor made false oaths regarding his income, operation of a business, and closing of bank accounts.  Each will be addressed in turn.

*Income*.  In the SOFA, the Debtor listed only $658.00 in gross income from employment or business operations for 2014, no income for 2015, and no income for 2016 up to the date of the bankruptcy filing in May.  (Jt. Ex. 20 at 26).  The evidence revealed, however, that the Debtor earned $400.00 or $500.00 per week from January 2014 to July or August 2014 from Turner Grain and that he earned $20,794.00 in gross farming income in 2014 through Daytana Farms LLC.  The evidence further revealed that the Debtor earned income in 2015 but did not list it because he had a net loss for that year.  It further revealed that the Debtor received $1,000.00 in rent from Wilson Farms in early 2016.  The Debtor's statements regarding gross income in his SOFA, therefore, were false statements made under oath.

*Business Operations*.  In his SOFA, the Debtor listed "none" when asked for information regarding businesses he had been involved in within the last six years as an "officer, director, partner, or managing executive of a corporation, partner in a partnership, [or] sole proprietor." (Jt. Ex. 20 at 31).  The evidence revealed, however, that in 2014 the Debtor started Daytana Farms as a limited liability company and he was the sole member of the company.  The Debtor's statement of "none" in response to Question 18 of the SOFA was a false statement made under oath.

*Bank Accounts*.  In his SOFA, the Debtor was asked to list all financial accounts closed within one year of the bankruptcy filing.  The Debtor listed an account with CCB that was closed

21

in 2015.  The evidence at trial was that he also withdrew all of the money from a savings account

at Southern Bancorp in early 2015, and that he closed a bank account sometime after 2014 at a

bank in Holly Grove used in connection with Daytana Farms.  The Debtor filed for bankruptcy

on May 15, 2016.  The Debtor's statements were made under oath, but the evidence was

insufficient to show they were false.  No specific dates were given for the withdrawal from the

Southern Bancorp account or the closing of the account in Holly Grove.  The Court finds that

CCB failed to meet its burden of proving the accounts were closed within one year of the

May 15, 2016, bankruptcy filing.  Because the second element is not met as to the listing of

closed bank accounts, the Court will not further analyze these oaths in its analysis under Section

727(a)(4)(A).

        <u>Knowledge, Intent, and Materiality.</u>

        The third, fourth, and fifth elements of the statute require that the false oaths were made

knowingly and with fraudulent intent, and that they relate materially to the bankruptcy case.

These three elements require an inquiry into the particular circumstances surrounding each of the

false oaths before a debtor's discharge will be denied.   The elements of knowing a statement is

false and making the statement with fraudulent intent must be separately proven.  *Merena v.*

*Merena (In re Merena)*, 413 B.R. 792, 815–16 (Bankr. D. Mont. 2009).  The term "knowingly"

requires that the debtor acted deliberately and consciously.  *Id.* at 816.

        Fraudulent intent under the false oath provision can be established by circumstantial

evidence, and "'statements made with reckless indifference to the truth are regarded as

intentionally false.'"  *In re Korte*, 262 B.R. at 474 (quoting *Golden Star Tire, Inc. v. Smith (In re*

*Smith)*, 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)).

In applying this statute, the Court recognizes that false oaths are not fraudulent *per se*. "A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence . . . [and] an honest error or mere inaccuracy is not a proper basis for denial of discharge." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294–95 (10th Cir. 1997) (citing *Nat'l Bank of Pittsburg v. Butler (In re Butler)*, 38 B.R. 884, 889 (Bankr. D. Kan. 1984) and *Drewes v. Magnuson (In re Magnuson)*, 113 B.R. 555, 559 (Bankr. D.N.D. 1989)).

Courts have found "[t]he threshold to materiality is fairly low: 'The subject matter of a false oath is "material," and thus sufficient to bar discharge if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *In re Sears*, 246 B.R. at 347 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984)).

In applying the facts of this case to the law cited above, the Court finds that the false oaths were made knowingly and with fraudulent intent, and that they relate materially to the bankruptcy case.

The Debtor's explanation for his failure to list the $400.00 or $500.00 per week earned in the first several months of 2014 was that he had forgotten about that income when answering the question in his SOFA. He admitted it was his mistake and he was adamant his omission was not intentional. As to his failure to list the $20,794.00 in gross income earned by Datana Farms, the Debtor explained that while the business earned gross income, the business also incurred $32,271.00 in expenses, for a net loss of $11,477.00, as shown on Schedule F of his federal income tax return. He did not list the gross income because, as he understood it, the business had a loss, not income. He offered the same explanation for not listing any income for 2015 on his SOFA, as he worked for himself that year and showed a net loss for the year rather than

income.  As to his failure to list the $1,000.00 in rent paid to him in early 2016 by Wilson Farms, the Debtor stated at trial that he simply forgot to include that money when answering this question on the SOFA.

At trial, when questioned about his failure to list Daytana Farms in response to Question 18 on the SOFA, the Debtor explained that he did not realize the question went back six years. He also explained he did not believe he needed to list the company because it did not exist at the time he filled out the SOFA.

The Court understands the Debtor's explanations, but finds the Debtor acted deliberately and consciously in omitting his 2014, 2015, and 2016 income and in failing to list Daytana Farms in response to Question 18 of the SOFA.  The Debtor was the party responsible for correctly filling out his schedules and SOFA in order to receive the protections of the Bankruptcy Code.  He knew he earned income from Turner Grain in 2014.  He also knew that Daytana Farms was operating in 2014 and that he worked for himself in 2015.  While he may have shown a net loss on his tax returns, the question on the SOFA asks for *gross* income, not net.  Furthermore, he knew he received $1,000.00 from Wilson Farms in 2016.  Likewise, the Debtor knew he set up Daytana Farms as a limited liability company in 2014, which was two years before the bankruptcy filing, and that he was the sole member of the company.  The SOFA requests information about such businesses for the six years prior to the bankruptcy filing.

No evidence was presented of any issues concerning the Debtor's ability to read or understand the questions presented or the information sought.  In addition, the Debtor was represented by learned counsel who, by signing the Debtor's petition, certified that he had no knowledge after an inquiry that the information in the schedules was incorrect.  *See* 11 U.S.C. § 707(b)(4)(D) (2012) ("The signature of an attorney on the petition shall constitute a certification

24

that the attorney has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect.").

The Court notes and appreciates the Debtor's candor concerning these omissions at trial, but taken together, the Court finds these omissions are too numerous and significant for the Court to overlook. A debtor completes the bankruptcy petition, schedules, and statement of financial affairs under oath, and the accuracy of this information is relied upon by various parties in interest including the trustee and creditors. Here, the Court does not believe the Debtor's misstated income and omissions can be ignored as mere carelessness or sloppiness. This is especially true in light of the fact that the omissions had not been corrected by the time of the trial, which was two years after the Debtor's bankruptcy filing.

The Court finds that the voluminous nature of the omissions supports a finding that the omissions were made knowingly. It also supports a finding that the omissions were made with reckless indifference to the truth. As with the March 2015 financial statement, the Debtor failed to carefully review the SOFA to ensure the accuracy of his responses. This was more than mere mistake or inadvertence.

Finally, the Court finds these omissions relate materially to the bankruptcy case. The omissions concern the Debtor's business transactions and the discovery of assets and business dealings. The false statements are significant to the Debtor's financial picture and, at a minimum, the listing of no income for 2015 and 2016 and the failure to disclose his interest in Daytana Farms hinders the trustee's duties in determining whether there are assets to be administered for the benefit of unsecured creditors.

Having found all five elements of Section 727(a)(4)(A) are met as it concerns the omissions on the SOFA regarding the Debtor's income and the disclosure of Daytana Farms, the Court finds that the Debtor's discharge should be denied.

## IV.

## CONCLUSION

For the reasons stated herein, the debt owed to CCB on the LOC Loan, which, as of May 22, 2018, was in the amount of $151,504.97, is hereby determined to be nondischargeable pursuant to Section 523(a)(2)(B), as the money was obtained through a false financial statement intended to deceive CCB, through the Debtor's reckless disregard for the truth, and on which CCB reasonably relied.

In addition, the Debtor's discharge is denied pursuant to Section 727(a)(4)(A) for his failure to list accurate income for 2014, 2015, and 2016 in his SOFA and his failure to disclose his interest in Daytana Farms, a limited liability company of which he was the sole member.

A separate judgment will be entered herewith.

**IT IS SO ORDERED.**

*Phyllis M. Jones*
Phyllis M. Jones
United States Bankruptcy Judge
Dated: 04/05/2019

Cc:    Vincent E. Guest
       Charles P. Allen, Jr.
       Debtor
       Cross County Bank
       A. Jan Thomas
       U.S. Trustee